Charles R. Toomajian III (SBN 302153)
   Email: charles.toomajian@zimmreed.com
ZIMMERMAN REED LLP
6420 Wilshire Blvd., Suite 1080
Los Angeles, CA 90048
Tel: (877) 500-8780
Fax: (877) 500-8781

*Counsel for Plaintiffs and the Proposed Class*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ELIJAH ZISKIN and CAMILA MONTOYA, individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> SPECIALIZED BICYCLE COMPONENTS, INC., <br><br> Defendant. | Case No. 26-cv-5616 <br><br><br> **CLASS ACTION COMPLAINT** <br><br> DEMAND FOR JURY TRIAL |

Plaintiffs Elijah Ziskin and Camila Montoya, individually and on behalf of similarly situated individuals, bring this class action suit for damages and equitable relief against Specialized Bicycle Components, Inc. ("Defendant" or "Specialized"). Plaintiffs allege the following based upon personal information as to allegations regarding themselves and the investigation of their counsel, and on information and belief as to all other allegations.

**NATURE OF THE ACTION**

1. Specialized designs, manufactures, imports, and sells bicycles, bicycle parts and components, and bicycle accessories to consumers ranging from hobbyists to elite cyclists.

2. Beginning in February 2025, President Trump issued a series of executive orders invoking the International Emergency Economic Powers Act ("IEEPA") to impose new and significant tariffs ("subject tariffs") on imports from nearly every foreign country, including those from which Specialized sources its products.

3. Following the imposition of the subject tariffs, Specialized publicly stated that it would implement price increases across its product lines to manage the financial impact of the subject tariffs. Consistent with these statements, Specialized increased the retail prices for its products in the United States to account for the cost of the newly imposed tariffs. Plaintiffs and the Class purchased Specialized products after these price increases took effect and, as a result, paid higher prices reflecting these tariff-related adjustments ("tariff surcharges").

4. At the same time, Specialized challenged the legality of the subject tariffs in the United States Court of International Trade, seeking to halt enforcement of the tariff orders and obtain refunds of the duties it paid because of the subject tariffs.

5. In demanding a refund for duties paid because of the subject tariffs, Specialized did not acknowledge that it had passed on the economic burden of those duties onto consumers through the tariff-specific adjustments. The case before the Court of International Trade was stayed pending the Supreme Court's resolution of *V.O.S. Selections, Inc. v. Trump*, in which businesses challenged the lawfulness of the subject tariffs.

6.      On February 20, 2026, the Supreme Court held that the subject tariffs were unlawful. *Learning Res., Inc. v. Trump*, 607 U.S. ___, Nos. 24-1287, 25-250, 2026 WL 477534, at *13–14 (U.S. Feb. 20, 2026). On remand, the Court of International Trade directed CBP to refund all IEEPA duties that were collected.

7.      Despite seeking and now being entitled to a refund of the duties collected as a result of the subject tariffs, Specialized has not refunded the tariff surcharges it collected from consumers. Upon the determination that the subject tariffs were unlawful, giving rise to Specialized's right to receive the duties it paid under the unlawful tariff scheme, Specialized was likewise obligated to return the corresponding tariff surcharge it collected from Plaintiffs and Class members. Specialized's retention of those surcharges unjustly profits Specialized at the expense of consumers.

8.      Accordingly, Plaintiffs, on behalf of themselves and the estimated tens or hundreds of thousands of similarly situated consumers, seek to ensure that their and the proposed Classes' contributions to paying the subject tariffs are returned and to demand appropriate monetary, equitable, injunctive, and declaratory relief.

## PARTIES

**I.      PLAINTIFFS**

9.      Plaintiff Elijah Ziskin is a Colorado resident. On February 2, 2026, Ziskin purchased a Specialized bicycle from a Specialized authorized independent dealer in Denver, Colorado. Plaintiff Ziskin was charged an increased price for his purchase that included the tariff surcharge Specialized imposed.

10.     Plaintiff Camila Montoya is a Texas resident. On January 11, 2026, Montoya purchased a Specialized bicycle from a Specialized retail store in Austin, Texas. Plaintiff Montoya was charged an increased price for her purchase that included the tariff surcharge Specialized imposed.

## II.     DEFENDANT

11.     Defendant Specialized Bicycle Components, Inc. is a privately held company incorporated under the laws of Delaware. Specialized's principal place of business is located at 15130 Concord Circle, Morgan Hill, California, 95037.

12.     Specialized Bicycle Components, Inc. markets, distributes, and sells its products to consumers throughout the United States, including within this District.

13.     At all times relevant to this Complaint, Specialized was authorized to conduct and conducted business in the State of California, and regularly marketed, distributed, and sold its products to consumers throughout the United States, including in this District.

**JURISDICTION**

14.     This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because this is a class action where the amount in controversy exceeds the sum or value of $5 million, exclusive of interest and costs, there are more than 100 putative members in the proposed class, and at least one Class Member (e.g., Plaintiffs) is a citizen of a state different from any Defendant.

15.     The Court also has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367 because all claims alleged are part of the same case or controversy.

16.     The Court has personal jurisdiction over Specialized Bicycle Components, Inc. because it's principal place of business is in this district. The Court also has personal jurisdiction over Specialized Bicycle Components, Inc. because it committed the acts alleged herein in California, regularly conducts business in this District, and has extensive contacts with this forum, including by selling and shipping its products to consumers in this District.

17.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this District and Defendant transacts substantial business in this District.

**FACTUAL ALLEGATIONS**

18.     Specialized is a global bicycle and cycling company that designs, manufactures, imports, and sells bicycles, bicycle frames, components, apparel, footwear and accessories.[1] Specialized operates across the entire bicycle industry including designing, manufacturing, importing, and retailing its products.

19.     By its own admission, Specialized is an importer of merchandise into the United States subject to the challenged subject tariffs described below.[2]

20.     Specialized owns and controls direct-to-consumer retail storefronts and e-commerce outlets for its products, including, company-owned Specialized retail stores across the United States and its direct-to-consumer e-commerce platform at specialized.com.[3]

21.     Specialized also sells its products through a network of authorized independent bicycle dealers and Specialized Concept Stores throughout the United States, through which it distributes its products nationwide.[4] Specialized designates which bicycle dealers are "Authorized Specialized Dealers," controls this designation, and can revoke this designation at will.

22.     Specialized directly controls retail pricing at Authorized Specialized Dealers through its Manufacturer's Suggested Retail Price, or MSRP, structure. Specialized unilaterally sets and publishes MSRP for its products.

23.     In Specialized's case, the Manufacturer's Suggested Retail Prices is, in fact, not a suggestion. Specialized exercises control over the prices at which its products are advertised and sold at its Authorized Specialized Dealers through a Minimum Advertised Price ("MAP") policy.[5]

---

[1] *See About Us*, Specialized, https://tinyurl.com/4zcjbtwn (last accessed, June 1, 2026).

[2] Complaint, *Specialized Bicycle Components, Inc. et al. v. United States Customs and Border Prot. et al.*, No. 1:25-cv-00852 (Ct. Int'l Trade Dec. 21, 2025), Dkt. No. 2.

[3] *See supra* n.1.

[4] *See Specialized to Add Consumer-Direct Sales on Feb. 1,* Bicycle Retailer & Indust. News (Jan. 27, 2022), https://tinyurl.com/mrpjjuyk.

[5] *Specialized Announces New MAP Policy*, Bicycle Retailer & Indust. News (Oct. 6, 2016), https://tinyurl.com/4mmf5n3e.

Specialized applies this policy to all U.S. dealers, and even retains a third-party provider to monitor and enforce MAP compliance.[6] Illustrating Specialized's degree of control, in implementing a new MAP policy in 2016, Specialized warned retailers that the policy would "discourage discount price advertising" inconsistent with its MAP.[7]

24.    Specialized sets the MAP prices for its Authorized Specialized Dealers exactly .01 cent lower than the MSRP price for that product. Through Specialized's MAP pricing and its limitations on the floor price Authorized Specialized Dealers may charge, Specialized has effective control of the prices of its products across all retail channels nationwide. This is especially true in the case of the Authorized Specialized Dealers because Specialized may unilaterally revoke its agreement with a dealer to enforce its pricing strategy, leaving those dealers unable to sell Specialized bikes—a critical deterrent considering Specialized is the third largest brand by market share in the U.S. bicycle market.[8]

## I.    PRESIDENT TRUMP ORDERS A SERIES OF TARIFFS.

25.    In early 2025, Specialized's Executive Vice President Robert Margevicius advocated to the Office of the United States Trade Representative in favor of imposing additional tariffs on imported goods.[9]

26.    Beginning in February 2025, President Trump issued a series of executive orders imposing new tariffs under the International Emergency Economic Powers Act (IEEPA), each tied to a declared national emergency.

---

[6] *Id.*

[7] *Id.*

[8] *See Specialized Company & Revenue*, ECDB, https://tinyurl.com/2s3s44v4 (last accessed, June 1, 2026).

[9] U.S. Trade Rep., Comment on Request for Comments To Assist in Reviewing and Identifying Unfair Trade Practices and Initiating All Necessary Actions To Investigate Harm From Non-Reciprocal Trade Arrangements (Feb 21, 2025), https://tinyurl.com/4yx2nvn7; *see also* Will Jones, *Specialized Vice President Lobbies US Government for Stricter Tariffs on Foreign Imports, Citing Illegal Import of Fentanyl as a Key Reason*, Cycling News (Apr. 2, 2025), https://tinyurl.com/dupcu896.

27.     On February 1, 2025, President Trump issued three orders directed at Mexico, Canada, and China, collectively referred to as the "Trafficking Tariff Orders."

28.     The executive order directed at Mexico imposed an additional 25 percent tariff on the import of goods from Mexico.[10]

29.     The executive order directed at Canada imposed a 25 percent tariff on the import of goods from Canada, with certain exceptions.[11]

30.     The executive order directed at China imposed an additional 10 percent ad valorem tariff on the import of goods from China on top of existing duties.[12] Through a series of amendments to this executive order, President Trump increased the tariff on the import of goods from China to 20%.[13]

31.     On April 2, 2025, President Trump issued a separate order—the "Reciprocal Tariff Order"—declaring U.S. trade deficits a national emergency.[14] Effective April 9, this order imposed a 10% baseline tariff on nearly all imports and added higher, country-specific "reciprocal" tariffs on 57 countries ranging from 11% to 50%.[15]

32.     Within days, China imposed retaliatory tariffs and the President raised the reciprocal tariff on China from 34% to 84%, and the next day increased it again to 125%, while temporarily

---

[10] Exec. Order No. 14194, *Imposing Duties To Address the Situation at Our Southern Border*, 90 Fed. Reg. 9,117 (Feb. 7, 2025).

[11] Exec. Order No. 14193, *Imposing Duties To Address the Flow of Illicit Drugs Across Our Northern Border*, 90 Fed. Reg. 9,113 (Feb. 7, 2025).

[12] Exec. Order No. 14195, *Imposing Duties to Address the Synthetic Opioid Supply Chain in the People's Republic of China*, 90 Fed. Reg. 9,121 (Feb. 7, 2025).

[13] Exec. Order No. 14200, *Amendment to Duties Addressing the Synthetic Opioid Supply Chain in the People's Republic of China*, 90 Fed. Reg. 9277 (Feb. 11, 2025); Exec. Order No. 14228, *Further Amendment to Duties Addressing the Synthetic Opioid Supply Chain in the People's Republic of China*, 90 Fed. Reg. 11,463 (Mar. 7, 2025).

[14] Exec. Order No. 14257, *Regulating Imports With a Reciprocal Tariff To Rectify Trade Practices That Contribute to Large and Persistent Annual United States Goods Trade Deficits*, 90 Fed. Reg. 15,041 (Apr. 7, 2025).

[15] *Id.*

6

suspending elevated tariffs for other countries.[16] When combined with the trafficking tariff, most Chinese imports now faced a minimum 145% tariff.

## II.    SPECIALIZED CHARGED CONSUMERS MORE BECAUSE OF THESE TARIFFS.

33.    Although they may be nominally directed extraterritorially, the increased costs created by the subject tariffs are borne almost entirely by U.S. importers and consumers.[17] The Dallas Federal Reserve concluded that the subject tariffs materially increased consumer prices and that the "pass-through from the 2025 tariffs is effectively complete."[18] In other words, that the costs of subject tariffs were ultimately borne exclusively by consumers.

34.    While importers must pay the subject tariffs at the border, wholesalers, manufacturers, and retailers all face a choice: whether to absorb the burden of the subject tariffs or to pass that burden on to their customers.[19] In most cases, including in the case of Specialized, the burden of tariffs is eventually passed on to U.S. consumers through retail price increases.[20]

35.    In a May 2025 survey of businesses in the New York-New Jersey region conducted by the Federal Reserve Bank of New York, three-quarters of both manufacturing and service businesses facing tariff-induced cost increases reported they passed along at least some of these higher costs to their customers by raising prices.[21] Among those businesses, 40% of manufacturers

---

[16] Exec. Order No. 14257, *Regulating Imports With a Reciprocal Tariff To Rectify Trade Practices That Contribute to Large and Persistent Annual United States Goods Trade Deficits*, 90 Fed. Reg. 15,041 (Apr. 7, 2025); Exec. Order No. 14259, *Amendment to Reciprocal Tariffs and Updated Duties As Applied to Low-Value Imports from the People's Republic of China*, 90 Fed. Reg. 15509 (Apr. 14, 2025); Exec. Order No. 14266, *Modifying Reciprocal Tariff Rates To Reflect Trading-Partner Retaliation and Alignment* (Apr. 9, 2025) 90 Fed. Reg. 15625 (Apr. 15, 2025).

[17] Julian Hinz, et al., *America's Own Goal: Who Pays the Tariffs?*, Kiel Inst. for the World Econ. (Jan. 19, 2026), https://tinyurl.com/ypsczz8y.

[18] *See* Ron Mau & Tucker Smith, *Effects of Realized Tariff Changes on PCE Prices Peaked in the First Quarter of 2026*, Fed. Rsrv. Bank of Dallas (May 5, 2026), https://tinyurl.com/2ht5my8j.

[19] Hinz, *supra* n.18 at 7.

[20] *Id.*

[21] Jaison R. Abel, et al., *Are Businesses Absorbing the Tariffs or Passing Them On to Their Customers?*, Fed. Rsrv. Bank of N.Y. (June 4, 2025), https://tinyurl.com/4sjnwbrp.

7

reported passing along greater than 75% of the tariff-induced cost to their customers. [22] Specialized's actions exemplify this process.

36.    Specialized asserts in its Court of International Trade Complaint that it paid duties imposed by the subject tariffs on a "continuous basis."[23] To offset these IEEPA duties, Specialized admits it passes tariff-induced cost increases on to its consumers.

37.    On April 9, 2025, Specialized announced it would implement 10% tariff surcharges on some of its products on May 1, 2025.[24]  Specialized North America Regional Leader Jesse Porter announced via an email to authorized dealers that these tariff surcharges would be listed as a separate line item on invoices.[25]

38.    In this April 9 email, Porter directly tied the increase in price to the subject tariffs, stating that "[Specialized] maintain[s] flexibility to update or remove the [tariff] charge if government tariffs change."[26] And this email "instructs dealers to pass the 10 percent increase on to customers."[27]

39.    At the end of August 2025, Specialized again announced in an email to authorized dealers that it would be increasing prices to offset its payment of increased duties because of the subject tariffs.[28] In that email, Porter outlined Specialized's plan for "Pricing and Tariff Impact" including "both wholesale and MSRP/MAP" price increases effective September 5.

40.    After the August 2025 email, Specialized required Authorized Specialized Dealers to implement price increases for a broad swath of Specialized products, ranging from $25 to $1,400.

---

[22] *Id.*

[23] CIT Complaint at 12, *supra* n.2.

[24] *Specialized Announces Pricing Strategy to Account for Increased Tariffs*, Bicycle Retailer & Indust. News (Apr. 16, 2025), https://tinyurl.com/2kehvt3m.

[25] *Id.*

[26] *Id.*

[27] Steve Larese, *Specialized, Trek Raise Prices as New Tariffs Take Affect*, BikeMag (Apr. 21, 2025), https://tinyurl.com/mskta7xs.

[28] *Cf.* Image posted by bobcatbicycles (@bobcatbicycles), Instagram (Sept. 6, 2025), https://tinyurl.com/4d2s5v7f.

41.     The increased MSRP and MAP prices were determined and set by Specialized and imposed unilaterally on the Authorized Specialized Dealers. These uniform pricing changes required for all Authorized Specialized Dealers confirm that the tariff surcharges on Specialized's products were not limited to Specialized's direct-to-consumer retail outlets, but instead directly affected retail pricing for all Specialized consumers.

42.     Specialized applied these tariff surcharges across its products and caused Specialized's consumers to pay a higher price for those products to cover the costs of the tariffs. This is especially the case because Specialized, as manufacturer, importer, distributer, and retailer, has control over every aspect of the pricing for its products whether through direct sales or through its agreements with independent authorized dealers.

43.     Specialized's tariff surcharges were designed to pass the costs resulting from the subject tariffs on to consumers via increased product prices.

44.     Plaintiffs and each member of the Class purchased one or more of Specialized's products after the subject tariffs were imposed. At that time, Plaintiffs and the Class paid tariff surcharges to Specialized through the purchase of Specialized's products either directly or at the Authorized Specialized Dealers.

**III.     SPECIALIZED SOUGHT AND IS ENTITLED TO REFUNDS OF DUTIES PAID.**

45.     In April 2025, several companies sued in the Court of International Trade challenging the legality of President Trump's executive orders and the resulting tariffs ("Challenged Tariff Orders").[29] That Court held the Challenged Tariff Orders were unlawful because they exceeded the President's authority under the IEEPA, granted declaratory relief that the Challenged orders were invalid as contrary to law, and issued a universal permanent injunction enjoining enforcement of the tariffs.

---

[29] *See* Complaint, *V.O.S. Selections, et al. v. Trump, et al.*, No. 25-cv-00066 (Ct. Int'l Trade Apr. 14, 2025), Dkt. No. 2.

CLASS ACTION COMPLAINT - No. 26-cv-5616

46.     The Federal Circuit affirmed the Court of International Trade's determination regarding the unlawfulness of the Challenged Tariff Orders and grant of declaratory relief but vacated the universal injunction *en banc*.[30]

47.     The Federal Circuit stayed its decision pending the Government's petition for a writ of certiorari and the Supreme Court's subsequent decision.[31] The Supreme Court granted certiorari and heard oral argument in *V.O.S. Selections, et al. v. Trump*, on November 5, 2025.

48.     Following the Federal Circuit's decision, on December 21, 2025, Specialized sued U.S. Customs and Border Protection (CBP) in the Court of International Trade seeking to enjoin the federal government from enforcing the Challenged Tariff Orders and an order refunding all unlawful duties collected from Specialized.[32] Shortly thereafter, the case was stayed pending the Supreme Court's determination in *V.O.S. Selections*.[33]

49.     Just as with the Plaintiffs in *V.O.S. Selections*, Specialized asserts the Challenged Tariff Orders are unlawful and sought a court order requiring the Government to refund "all IEEPA duties collected from Plaintiffs, with interest as provided by law."[34]

50.     In its complaint, Specialized makes no mention of the consumers, including Plaintiffs and the Class members, who bore the burden of the subject tariffs through a tariff surcharge implemented by Specialized.

51.     Nor has Specialized stated its intention to return tariff surcharges to consumers if it is issued a refund. Notably, other companies including FedEx have made such assurances to consumers stating that "if refunds are issued to FedEx, we will issue refunds to the shippers and

---

[30] *V.O.S. Selections, Inc. v. Trump*, 149 F.4th 1312, 1347 (Fed. Cir. 2025), *cert. granted*, 146 S. Ct. 73, 222 L. Ed. 2d 1231 (2025).

[31] Order, *V.O.S. Selections*, 149 F.4th at 1347 (Aug. 29, 2025), Dkt. No. 161.

[32] CIT Complaint at 15, *supra* n.2.

[33] Text Entry, *Specialized Bicycle Components, Inc. v. U.S. Customs and Border Prot. et al.*, No. 1:25-cv-00852 (Dec. 23, 2025), Dkt. No. 8.

[34] *Id.*

consumers who originally bore those charges."[35] UPS has likewise committed to refunding tariff payments to customers who paid for them, stating that UPS "will request and retrieve IEEPA tariff refunds from CBP on our customers' behalf. … After we receive the funds from CBP, we have established a process to issue refunds to the payors."[36]

52.     On February 20, 2026, the Supreme Court of the United States held that the subject tariffs are unlawful because the imposition of such tariffs exceeds President's authority under the IEEPA. *Learning Res*., 2026 WL 477534, at *13–14. In so doing, the Supreme Court affirmed the judgment of the Court of Appeals in *V.O.S. Selections, Inc*., 149 F.4th 1312. Given this unappealable decision, there is now no ambiguity as to the unlawfulness of the subject tariffs. And as Justice Kavanaugh noted in his dissent, "the interim effects of the Court's decision could be substantial," including requiring the United States to "refund billions of dollars to importers who paid the [subject] tariffs, even though some importers may have already passed on costs to consumers or other." *Learning Res., Inc. v. Trump*, 607 U.S. ___, Nos. 24-1287, 25-250, 2026 WL 477534, at *51 (U.S. Feb. 20, 2026) (Kavanaugh, J., dissenting).

53.     On April 17, 2026, following remand, the Court of International Trade directed CBP to (1) liquidate any unliquidated entries that were subject to IEEPA duties without applying those duties, and (2) reliquidate without IEEPA duties any liquidated entries for which liquidation is not yet final. This means CBP must refund all IEEPA duties that were collected.

54.     CBP has set up a new system called the Consolidated Administration and Processing of Entries (CAPE) tool, which importers can use to submit refund requests. Once a CAPE Declaration is accepted, CBP removes the IEEPA tariff codes from the entry summaries, recalculates duties as if the IEEPA charges were never assessed, and prepares a refund for the difference—with interest included automatically.

[35] *Navigating U.S. Tariffs and Customs Regulations*, FedEx, https://tinyurl.com/y66sxmxe (last visited June 4, 2026).

[36] *IEEPA Tariff Refund Process*, UPS, https://tinyurl.com/yc6mx956 (last visited June 4, 2026).

55. As Justice Kavanaugh anticipated, Specialized sought and is entitled to a refund for tariff payments it has already passed on to consumers. To the extent that Specialized is entitled to a refund for its payments of the subject tariffs, Plaintiffs and the Class are entitled to restitution of the tariff surcharge Specialized charged them at the time of their purchases. If Specialized retains the refund of tariffs that it did not ultimately bear the full expense of in the first place, and which were instead borne by consumers, Specialized will receive an unjust windfall of funds that rightfully belong to Plaintiffs and the Class.

56. If Plaintiffs and the Class had known that Specialized would unfairly retain the tariff surcharge Specialized imposed on customers despite asserting the subject tariffs were illegal, they would not have purchased or would have paid less for Specialized's products.

## CLASS ACTION ALLEGATIONS

57. Plaintiffs bring this action on behalf of themselves and on behalf of all others similarly situated (the "Nationwide Class") as a class action pursuant to Fed. R. Civ. P. 23(b)(2), (b)(3), and (c)(4). Plaintiffs seek certification of a class initially defined as follows:

> **Nationwide Class**: All individuals in the United States who purchased a Specialized product through Specialized or at an Authorized Specialized Dealer within the Class Period.

58. Pursuant to Fed. R. Civ. P. 23(b)(2), (b)(3), and (c)(4), Plaintiff Ziskin brings this action on behalf of the following Colorado Class initially defined as:

> **Colorado Subclass:** All individuals in the state of Colorado who purchased a Specialized product through Specialized or at an Authorized Specialized Dealer within the Class Period.

59. The Nationwide Class is referred to herein as the "Class," and the Colorado Subclass is referred to herein as the "Subclass," unless otherwise stated.

60. Excluded from the above Class and Subclass are Specialized, including any entity in which Specialized have a controlling interest, is a parent or subsidiary, or which is controlled by Specialized, as well as the officers, directors, affiliates, legal representatives, heirs, predecessors,

successors, and assigns of Specialized. Also excluded are the judges and court personnel in this case and any members of their immediate families.

61.    Plaintiffs reserve the right to amend the Class or Subclass definition if discovery and further investigation reveal that the Class should be expanded or otherwise modified.

62.    The Class Period begins on February 1, 2025, up to the date this action was commenced and continues through the present and the date of judgement. Plaintiffs reserves the right to amend or modify the class definition(s) with greater specificity, by further division into subclasses, and/or by limitation to particular issues. As described below, the Class and Subclass both satisfy the elements of Fed. R. Civ. P. 23(a) and Rule 23(b).

63.    **Numerosity**. The Class and Subclass members are so numerous that joinder of each individual class member would be impracticable and unfeasible. The Class consists of thousands of Specialized customers who made purchases during the Class Period, and the Sublcass includes several hundred, or more, customers. The customers included in the Class and Subclass are ascertainable, as the identities can be determined by objective means. The Class and Subclass are, however, so large that Class and Subclass members cannot be consolidated in one complaint and it, therefore, would be impractical for each to bring suit individually. Plaintiffs do not anticipate any difficulties in the management of the action as a class action.

64.    **Commonality and Predominance**. There is a well-defined community of interest among the Class and Subclass members and common questions of both law and fact predominate over questions affecting individual members. These common legal and factual questions include, but are not limited to, the following:

1.    Whether Defendant passed on tariff-related charges onto customers;

2.    Whether consumers paid increased prices for Defendant's products attributable to the cost of tariffs;

3.    The amount to which consumers paid for the costs of tariffs;

4.    Whether Defendant's retention of tariff refunds is unjust without payment;

5.    Whether Defendant acted unfairly or deceptively by charging consumers for tariff-related costs and then retaining any reimbursements of those tariff charges;

13

6.      Whether Plaintiffs and the Class and Subclass members are entitled to equitable relief, including, but not limited to, restitution as requested in this Complaint;

7.      Whether Defendant's conduct has harmed Plaintiffs and the Class and Subclass uniformly; and

8.      Whether declaratory relief would afford uniform benefits to the Class.

65.     **Typicality**. Plaintiffs' claims are typical of those of the Class and Subclass members in that they arise out of the same course of wrongful conduct committed by Defendant, including its inequitable retention of tariff refunds which rightfully belong to Plaintiffs and Class members. Plaintiffs and Class members have experienced the same harm, including loss of a uniform tariff surcharge on their purchases. The effort Plaintiffs undertake to pursue their own claims will significantly benefit the Class members because of the identical nature of the issues across the Class.

66.     **Adequacy of Representation**. Plaintiffs will continue to fairly and adequately represent and protect the interests of the members of the Class and Subclass. Plaintiffs share a common interest with the Class members, with respect to the conduct of the Defendant herein and redress of injury. Plaintiffs have suffered an injury-in-fact because of the conduct of the Defendant, as alleged herein. Plaintiffs have retained counsel who are competent and experienced in the prosecution of complex class actions. Plaintiffs and their counsel intend to prosecute this action vigorously and faithfully for the benefit of the Class members. Plaintiffs and Plaintiffs' counsel have no contrary interests to the Class members and will fairly and adequately protect the interests of the Class.

67.     **Rule 23(b)(2) Class Certification is Appropriate**. Plaintiffs seek specific declaratory relief that would provide relief to the entire Class and Subclass and would remedy a Class-wide harm. Plaintiffs and Class members have been harmed due to a uniform course of conduct. Defendant subjected Plaintiffs and Class members to the same unfair, unlawful, and unfair practices and harmed them in the same manner by retaining tariff refunds that rightfully belonged to Plaintiffs and Class members.

68.     A uniform declaration would benefit the Class and Subclass as a whole. Plaintiffs seek declaratory relief that would prevent Defendant from unfairly retaining tariff refunds consisting of Plaintiffs' monies and require Defendant to return those monies to Plaintiffs and the Class members.

## CLAIMS FOR RELIEF

### COUNT I
### Money Had and Received
(On Behalf of Plaintiffs and the Nationwide Class)

69.     Plaintiffs incorporate by reference the facts alleged above.

70.     Plaintiffs allege this claim individually and on behalf of the proposed class.

71.     Defendant received money from Plaintiffs and from each member of the proposed Class in the form of a tariff surcharge. The Supreme Court has determined that the tariffs were unlawful.

72.     The money belonged to Plaintiffs and to each member of the proposed Class.

73.     Defendant has not returned the money.

74.     It will give offense to equity and good conscience if Defendant is permitted to retain the tariff surcharge. Plaintiffs seek the return of the money in an amount to be proven at trial.

75.     Plaintiffs seek all remedies available under the law, including, if available, actual damages, nominal damages, compensatory damages, punitive damages, and injunctive relief, and other remedies available to him.

### COUNT II
### Unjust Enrichment
(On Behalf of Plaintiffs and the Nationwide Class)

76.     Plaintiffs incorporate by reference the facts alleged above.

77.     Plaintiffs allege this claim individually and on behalf of the proposed class.

78.     As described herein, Defendant charged Plaintiffs and each member of the proposed class tariff surcharges when they purchased Defendant's products. By collecting these tariff surcharges, Defendant received and knowingly and willingly accepted a direct benefit at Plaintiffs

and the members of the proposed Class's expense. The Supreme Court has determined that the tariffs were unlawful.

79.    It would be unjust for Defendant to retain tariff surcharges to cover the expense of the subject tariffs when Defendant is entitled to a refund for the subject tariffs paid.

80.    Defendant's unjust conduct was the proximate cause, and a substantial factor, in causing Plaintiffs and the members of the proposed Class's losses and damages.

81.    Plaintiffs seek the return of the tariff surcharges in an amount to be proven at trial.

## COUNT III
### Declaratory Relief, 28 U.S.C. § 2201
(On Behalf of Plaintiffs and the Nationwide Class)

82.    Plaintiffs incorporate by reference the facts alleged above.

83.    Plaintiffs allege this claim individually and on behalf of the proposed Class.

84.    Federal courts have the power "to declare the rights and other legal relations of any interested party seeking such a declaration." 28 U.S.C. § 2201(a).

85.    Plaintiffs' claims present an actual controversy as to the rightful ownership of the tariff surcharges paid to Defendant.

86.    Plaintiffs have suffered an injury by having been required to pay Defendant a tariff surcharge because of the subject tariffs on Defendant's products. And Plaintiffs will imminently suffer an injury by Defendant's unlawful retention of the tariff refund.

87.    This Court can exercise its equitable power to enter a declaratory judgment that retention of the tariff surcharges paid by Plaintiffs but refunded to Defendant is unlawful for any of the above reasons.

## COUNT IV
### Cal. Bus. & Prof. Code §§ 17200, et seq. (California Unfair Competition Law or "UCL")
(On Behalf of Plaintiffs and the National Class)

88.    Plaintiffs incorporate by reference the facts alleged above.

89.    Plaintiffs allege this claim individually and on behalf of the proposed Class.

90. The California UCL declares it unlawful for any person to commit an act of "unfair competition", including "any unlawful unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising . . . ." Cal. Civ. Code § 17200. "[U]nfair competition" is interpreted broadly to include acts that violate other laws and may include acts event if not specifically proscribed by some other law.

91. Defendant engaged in consumer-oriented conduct by marketing and selling its products to consumers, including Plaintiffs and Class Members, through their websites, retail stores, and other retail channels.

92. Defendant's retention of tariff refunds, despite having shifted those costs to consumers via tariff surcharges, is an unfair practice under the UCL. Consumers paid more than the value they received, and Defendant unlawfully kept the resulting surplus.

93. Defendant knew or should have known of its unfair conduct. And there existed reasonable available alternatives to further Defendant's legitimate business interests, other than the conduct described herein.

94. Defendant's retention of tariff refunds is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers.

95. Plaintiffs and the Class Members have been injured because of Defendant's unfair practices, suffering an ascertainable loss by paying more for a product than they otherwise would have but for the tariff surcharge.

96. This harm to Plaintiffs and the Class greatly outweighs the public utility of Defendant's conduct. Defendant's conduct—specifically, its retention of tariff refunds despite having shifted those costs to consumers—has no public utility.

97. Defendant acted intentionally, knowingly, and maliciously to violate the UCL, and recklessly disregarded Plaintiffs and the Class Members's rights.

98. As a result of Defendant's violations of the UCL, Plaintiffs and the Class seek all monetary and non-monetary relief allowed by law, including restitution of all profits stemming from Defendant's unfair business practices; declaratory relief; reasonable attorneys' fees and costs

17

under California Code of Civil Procedure § 1021.5; injunctive relief; and other appropriate equitable relief.

**COUNT V**
**Violation of Colorado Consumer Protection Act,**
Colo. Rev. Stat. §§ 6-1-101, *et seq*.
(On behalf of the Colorado Subclass)

99.    Plaintiff Ziskin, individually and on behalf of the Colorado Class, repeats and realleges the allegations contained in the preceding paragraphs as if fully set forth herein.

100.    The Colorado Consumer Protection Act declares it unlawful for any person to "either knowingly or recklessly engage[] in any unfair, unconscionable, deceptive, deliberatively misleading, false, or fraudulent act or practice" in the "course of the person's business, vocation, or occupation." Colo. Rev. Stat. § 6-1-105(1).

101.    Specialized is a "person" as defined by Colo. Rev. Stat. § 6-1-102(6).

102.    Specialized engaged in "sales" as defined by Colo. Rev. Stat. § 6-1-102(10).

103.    Plaintiff and Colorado Class Members, as well as the general public, are actual or potential consumers of the products and services offered by Specialized or successors in interest to actual consumers.

104.    Specialized's retention of tariff refunds, despite having shifted those costs to consumers via tariff surcharges, is an unfair practice under the Colorado Consumer Protection Act. Consumers paid more than the value they received, and Defendant unlawfully kept the resulting surplus.

105.    Specialized acted intentionally, knowingly, and maliciously to violate the Colorado Consumer Protection Act, and recklessly disregarded Plaintiff Ziskin and Subclass Members' rights.

106.    As a direct and proximate result of Specialized's unfair practices, Plaintiff Ziskin and Colorado Subclass Members suffered injuries and damages.

107.    Specialized's unfair practices significantly impacted the public, because many members of the public are actual or potential consumers of Specialized's products.

18
CLASS ACTION COMPLAINT - No. 26-cv-5616

108.   Plaintiff Ziskin and Colorado Class Members seek all monetary and non-monetary relief allowed by law, including as to Plaintiff the greater of: (a) actual damages with interest, (b) $500, or (c) three times actual damages; injunctive relief; and reasonable attorneys' fees and costs, and, if certified, as to the Class actual damages, injunctive relief, and reasonable attorneys' fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually, and on behalf of all others similarly situated, respectfully requests that the Court enter an order:

a.   Certifying the Class as requested herein;

b.   Appointing Plaintiffs as Class Representative and undersigned counsel as Class Counsel;

c.   Finding that Defendant engaged in the unlawful conduct as alleged herein;

d.   Granting permanent injunctive relief to prohibit and prevent Defendant from continuing to engage in the unlawful acts, omissions, and practices described herein;

e.   Awarding Plaintiffs and Class and Subclass members compensatory, consequential, and general damages, including nominal damages as appropriate, for each count as allowed by law in an amount to be determined at trial;

f.   Granting the declaratory relief sought herein;

g.   Awarding statutory damages, trebled, and/or punitive or exemplary damages, to the extent permitted by law;

h.   Ordering disgorgement and restitution of all profits received or retained by Defendant as a result of its unfair acts, omissions, and practices;

i.   Awarding to Plaintiffs the costs and disbursements of the action, along with reasonable attorneys' fees, costs, and expenses; and

j.   That the Court grant such other relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a jury trial.

19

Dated: June 10, 2026

Respectfully submitted,

**ZIMMERMAN REED LLP**

_/s/ Charles R. Toomajian III_

Charles R. Toomajian III (SBN 302153)
6420 Wilshire Blvd., Suite 1080
Los Angeles, CA 90048
Tel: (877) 500-8780
Fax: (877) 500-8781
Charles.Toomajian@zimmreed.com

_Counsel for Plaintiffs and the Proposed Class_

CLASS ACTION COMPLAINT - No. 26-cv-5616